# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KATHLEEN S. CABERNOCH, as Mother and Next of Friend of WILLIAM CABERNOCH, Jr., a Minor,<br><br>    Plaintiff,<br><br>    v.<br><br>UNION LABOR LIFE INSURANCE COMPANY,<br><br>    Defendant. | No. 06 C 1515<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

In 2003, William Cabernoch died of burns and inhalation injuries he sustained when the automobile he was sitting in caught fire in front of his home. He had been drinking in the evening prior to the start of the fire. His level of intoxication is not recorded on the death certificate. The reason for the fire remains unknown. The cause of death was inhalation injuries and thermal burn.

When he died, he had a valid life insurance policy through Defendant Union Labor Life Insurance Company ("Union Labor"). He bought the policy in 1994 in response to a mail solicitation. The policy excluded "loss caused by or resulting from . . . an injury that occurs while intoxicated." Defendant denied the claim for the $150,000 death benefit on the basis of this exclusion. Plaintiff sues for the benefit and associated remedies. There are cross-motions for summary judgment.

Plaintiff sues to collect the benefit, arguing that it is against the public policy of Illinois (whose law governs here) to preclude recovery based upon the fact that the insured was

intoxicated if there is no showing that the intoxication played some role in the death of the insured.[1] The Seventh Circuit has ruled that "status intoxication" exclusions violate the follow Illinois Insurance Code, both 215 ILL COMP. STAT. 5/357.14 and 5/357.26. *See Holloway v. J.C. Penney Life Insurance*, 190 F.3d 838, 839 (7th Cir. 1999) ("Under Penney's version of the policy, if the insured was sitting on her porch drinking beer and was struck by a meteor, she would not be covered by the policy."). Indeed, in deposition, Defendant's representative said that if Plaintiff had died by meteor strike, the benefit would not be paid. It is quite clear that Defendant denied the claim solely because William Cabernoch was intoxicated.[2]

Plaintiff argues that Defendant cannot prove any connection between the drinking and the death. Defendant's medical consultant, Plaintiff asserts, does not have an adequate factual basis to conclude that such a connection existed. As a result, Plaintiff concludes that the benefit should be paid and the penalty and attorneys' fees should be awarded under the well-known Section 155 of the Illinois Insurance Code, which penalizes unreasonable and vexatious denials of benefits. 215 ILL. COMP. STAT. 5/155. In any event, the winning beneficiary also receives pre-judgment interest.

---

[1]This issue has a family resemblance to the debate over whether a defendant can offer the failure of an injured person to wear a seat belt at the time of a vehicle collision. After some fits and starts, Illinois courts held that such evidence is admissible only when a causal connection between the absence of the belt and the injury sustained is supported by proof. *See Old Second Nat'l. Bank v. Baumann*, 408 N.E.2d 224 (Ill. App. Ct. 1980).

[2]Union Life's medical consultant stated at deposition that William Cabernoch could have been so intoxicated on the night of the fire that he lacked the ability to exit the vehicle. But he was not consulted about this possibility in his dealings with Union Life and did not know enough about the details of the fire to opine whether it would have been feasible for a sober passenger to exit. The only grounds for the denial of benefits was the fact of intoxication, not the consequences resulting therefrom.

Defendant counters that it is not Illinois law here but ERISA law that must decide the case.[3] And, in any event, they argue that they prevail on the undisputed facts.

The fire was called in to the Hartford, Illinois Fire Department at about one in the morning on November 20. While firefighters worked to extinguish the fire, a Captain/EMT Jamie Scott Wells heard that somebody might be in the car. He reached into the driver's side and found no one. Moving to the passenger side, he found Cabernoch inside and rolled him out of the vehicle. An unlatched seat belt was over Cabernoch's shoulder when Wells found him. At the hospital (in St. Louis County) blood tests showed an alcohol level of .316 %.

The attending physician, Dr. Michael Smock, noted that the facial burns were not deep enough to have caused unconsciousness, immobility or incapacitation. Head or body trauma, which might have caused inability to move, was absent. The burns were not consistent with an

---

[3]The policy was part of a group insurance plan which, if offered by an "employee organization" like a union may be governed by ERISA. ERISA regulations do not apply to group insurance programs offered to union members if no contributions are made by the employer or the union, participation is voluntary for members, neither union nor employer does anything more than permit the insurer to sell the policy and collects premiums from employees and pays the insurer. Except for reimbursement for collecting premiums, neither the union nor the company can take anything of value from the insurer. Another thing the union and company may not do is endorse the program. Endorsement of the policy may trigger application of ERISA because it leads union members to believe the group insurance is a program the union establishes or maintains. *See Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1134 (1st Cir. 1995) ("It is only when an employer purposes to do more [than merely advise employees of the availability of group insurance, accept payroll deductions, pass them on to the insurer, and perform other ministerial tasks that assist the insurer in publicizing the program], and takes substantial steps in that direction, that it offends the ideal of employer neutrality and brings ERISA into the picture."). The policy at issue here was issued by Defendant Union Privilege, which is not an employee organization. The insurers went around to various unions to get them to subscribe to the program. The IBEW, to which Cabernoch belonged, signed on and, by so doing, may have endorsed the policy. Two other District Judges found endorsement with respect to this very plan. *See Pederson v. Union Labor Life Ins. Co.*, 2006 WL 3474183 (E.D.Wis. 2006); *Dipper v. Union Labor Life Ins. Co.*, 400 F.Supp.2d 604 (S.D.N.Y. 2005).

explosion, so Dr. Smock believed a sudden catastrophic event had not occurred. The physician opined that a person who had passed out from intoxication would be slower in sensing the heat of a fire and would have diminished judgment and physical motor skills. Incapacitation from inhalation injuries would not have occurred quickly, it would have been a matter of minutes, rather than seconds.

Dr. Smock agreed with the Medical Examiner's conclusion that acute alcohol intoxication contributed to Cabernoch's death. Dr. Mary Case, the examiner, also concluded that Cabernoch was so intoxicated that he probably was unable to exit. She said that a .316 blood alcohol level was extremely high and would markedly impair his ability to perceive danger and to take appropriate action to avoid it. She thought that even if he had seen the threat, it would have been very difficult for him to get out.

Cabernoch did not expire in the emergency room. He was treated for some days. His treating physician thought that the facial burns would not have rendered him unconscious and noted that there was no head trauma (because there was no skull fracture or intra-cranial bleeding). Neither was there evidence of a muscle injury or spinal injury that would have disabled his ability to leave his seat in the vehicle.

Police investigators discovered a witness who had seen Cabernoch at the American Legion Hall before the car fire. The witness said Cabernoch was "pretty drunk."

The state fire marshal's investigator told the police that he believed the fire started in the engine compartment because of the damage in that compartment and the burn pattern that showed movement from the compartment to rest of the vehicle. The investigator had never heard

of a case in which a "fire ball" or wall of fire suddenly entered the passenger compartment from the engine.

Under ERISA, the question is whether the status inclusion is enforceable. In ERISA cases, we are not bound by state law but rather by federal rules developed, over time, by the common law method. Neither side cites a decision stating or creating a common law rule that specifically controls the outcome of the question presented here. It is a principle that an ERISA plan must be enforced pursuant to its written terms. Defendants reason that since the policy says that an intoxicated policy holder hit by a falling meteor is out of luck, its denial of the claim here was proper. This is a fairly unpalatable argument, and Defendant does not devote much effort in trying to support it. This is understandable considering the lightly mocking way in which our Court of Appeals address this proposition in *Holloway*.

Defendant's reading of the policy is not the only possible interpretation. The contract says that the exclusion applies if the loss was caused by or resulted from an injury that occurred while the covered individual was intoxicated. Intoxication is usually determined by the degree of impairment. We punish (civilly and criminally) that intoxication which impairs a person's ability to perform, say, as a driver. The legal conclusion that a person drove while impaired by cocaine, for instance, is usually dependent upon evidence that the car reached speeds of 100 m.p.h. on Lake Shore Drive, its driver seemed unaware of the sound of sirens and the presence of flashing lights, spoke rapidly and incoherently to the police and put a vial of powder cocaine on his dashboard. That is to say, impairment is judged by its relationship to the actions of the person said to be impaired. Intoxication, by contrast, has legal consequences only in relation to its effects on the actions of the person said to be intoxicated.

5

Until the latter part of the past century, this was the way in which all intoxication was judged in a legal context. Blood alcohol changed this, but only with respect to alcohol intoxication. Impairment is presumed if a certain level of ethanol is found in the blood. No matter how perfectly someone with .08% blood alcohol drives, they are legally presumed to be impaired (although if they do drive perfectly they are unlikely to see the inside of a traffic court).

The policy here does not define intoxication; it relies on the generic notion. To apply the policy to a specific set of facts, one cannot simply say that the insured had a lot to drink and we can assume he was impaired. The company must show impairment by examining the conduct of the insured. This can be done, in the context of this case, by showing that the insured's conduct had some connection to the harm against which he was insured. A common law judge would properly conclude that, absent a specific definition of intoxication, one proves intoxication by showing that it impaired the insured. One proves impairment by showing that, say, a physically able and unimpaired man in Cabernoch's position would probably have gotten out of the burning car.[4] So I do have to consider whether the level of alcohol he consumed played a role in his death and, unsurprisingly, this is the proposition to which Defendant devotes the largest portion of its argument.

It appears that there is evidence that intoxication could have played a significant role in Mr. Cabernoch's death. It may be shown to be the sole cause of his death, though that is not to say that he would not have received some significant injuries even if he were sober. The

---

[4]I express no view on whether Defendant could have written a policy that defined intoxication from alcohol to be the prohibited blood alcohol level adopted by state motor vehicle law and, if that level is proved, the insured cannot collect even if the meteor hits.

insurance company may be able to prove that the exclusion, as I have interpreted it, was properly applied. However neither side is entitled to summary judgment on this question.

The parties do not dispute that the deference that is accorded to the discretionary decision of those who administer conventional ERISA funds is not applicable here, so my decision is *de novo*. Under either Illinois law or ERISA common law, I am not restricted to the administrative record when I use the *de novo* standard to review the denial of the benefit. *See Perlman v. Swiss Bank Corp. Plan*, 195 F.3d 975 (7th Cir. 1999). Plaintiff does argue that the papers show that Defendant used the wrong standard in deciding to apply the exclusion. While that is likely true, it does not end the case because Defendant may be able to show that the denial of benefits would nonetheless be proper, even under the correct standard.

The practical difference here between ERISA rules and state law rules is substantive rather than procedural. Under 29 U.S.C. § 1144(b)(2)(A), ERISA does not pre-empt state laws regulating insurance like those which limit or qualify exclusions. What is pre-empted is § 155 of the Illinois Insurance Code, which does not regulate insurance but rather provides a remedy for a violation of a regulation. In simple terms, the first question to be decided under either state or federal law is whether the policy exclusion is properly applicable to this case. If the answer is yes, then Plaintiff has lost. Only if the answer is no, will the question of § 155 penalty and fees be addressed.

I believe it would be wisest to defer final decision whether ERISA governs this case to the exclusion of state law until it becomes necessary to decide it.

The cross motions for summary judgment are denied.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: April 3, 2008