UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN S. CABERNOCH, As Mother and Next of Friend of WILLIAM CABERNOCH, JR., a Minor,<br><br>    Plaintiff,<br><br>    v.<br><br>UNION LABOR LIFE INSURANCE COMPANY,<br><br>    Defendant. | No. 06 C 1515<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

### I. BACKGROUND

Plaintiff seeks insured's death benefit which Defendant insurer denied pursuant to an intoxication exclusion contained in the accidental death insurance policy. Both parties now move for summary judgment.

### II. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits" indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). With cross-motions, I construe all inferences in favor of the party against whom the motion under consideration is made. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund,* 390 F.3d 1040, 1045 (7th Cir.2004) (citation and quotation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**III. STATEMENT OF RELEVANT FACTS**

On November 20, 2003, emergency responders found William Cabernoch in the passenger seat of a burning automobile parked in front of his home, a slack, unfastened seatbelt draped over his shoulder. He was removed from the vehicle and taken to the hospital where he was treated for burns and inhalation injuries. He died on December 4, 2003. According to the Medical Examiner's report, Cabernoch's blood alcohol level upon admission to the hospital was 0.316, nearly four times the legal limit in Illinois, however it was not listed as the cause of death. The cause of the fire has never been discovered.

The attending hospital physician, Dr. Michael Smock, noted that Cabernoch's facial burns were not deep enough to have caused unconsciousness, immobility or incapacitation. Head or body trauma, which might have caused inability to move, was absent. The burns were not consistent with an explosion, so Dr. Smock believed a sudden catastrophic event had not occurred. The physician opined that a person who had passed out from intoxication would be slower in sensing the heat of a fire and would have diminished judgment and physical motor skills. Incapacitation from inhalation injuries would not have occurred quickly, it would have been a matter of minutes, rather than seconds.

Dr. Smock agreed with the Medical Examiner's conclusion that acute alcohol intoxication contributed to Cabernoch's death. Dr. Mary Case, the examiner, also concluded that Cabernoch was so intoxicated that he probably was unable to exit. She said that a .316 blood alcohol level was extremely high and would markedly impair his ability to perceive danger and to

2

take appropriate action to avoid it. She thought that even if he had seen the threat, it would have been very difficult for him to get out.

Cabernoch's treating physician thought that the facial burns would not have rendered him unconscious and noted that there was no head trauma (because there was no skull fracture or intra-cranial bleeding). Neither was there evidence of a muscle injury or spinal injury that would have disabled his ability to leave his seat in the vehicle.

Police investigators discovered a witness who had seen Cabernoch at the American Legion Hall before the car fire. The witness said Cabernoch was "pretty drunk." In her deposition, the bartender on duty that evening testified that Cabernoch was at the hall for ninety minutes to two hours and consumed two beers and at least three to four shots of whisky. She saw Cabernoch stagger sideways when he got up to leave. He refused her offer for a ride home.

The state fire marshal's investigator told the police that he believed the fire started in the engine compartment because of the damage in that compartment and the burn pattern that showed movement from the compartment to the rest of the vehicle. The investigator had never heard of a case in which a "fire ball" or wall of fire suddenly entered the passenger compartment from the engine.

Defense expert, Dr. Michael Evans, president and chief executive officer of the American Institute of Toxicology Laboratories, opined that Cabernoch's failure to exit the automobile after the start of the fire was due to his intoxication. [1]

---

[1] Plaintiff urges the court to strike Dr. Evans' report, claiming tardy disclosure in violation of Fed.R.Civ.P. 26(a)(2). Plaintiff cites no legal basis for this argument, nor does she allege any prejudice as a result of this alleged violation. I therefore deny Plaintiff's request to strike.

At the time of his death, Cabernoch had a valid accidental death policy through Defendant Union Labor Life Insurance Company ("Union Labor"), which he had purchased in 1994 after receiving a direct mail solicitation. As a member of the International Brotherhood of Electrical Workers ("IBEW"), Cabernoch was eligible for this policy, which was the result of IBEW's 1993 subscription to a Master Agreement between Union Privilege Trust ("Union Privilege"), Union Labor Life Insurance Company ("ULLIC"), and Unioncare. Upon Cabernoch's death, the beneficiaries of his accidental death plan made a claim for benefits. On May 24, 2004, Defendant Union Labor Life denied payment of benefits pursuant to a policy provision that excludes "loss caused by or resulting from . . . an injury that occurs while intoxicated." Plaintiff sues to collect the $150,000 benefit and associated remedies.

Both parties currently move for summary judgment. Plaintiff maintains that Illinois law, which should govern here, prohibits the status intoxication exclusion. Defendant asserts that the plan must be enforced pursuant to its terms, as it falls under the Employee Retirement Income Security Act of 1974 ("ERISA"), which preempts state law. Defendant further argues that even if a causation requirement is applied, Defendant would still prevail because "there is no question that Cabernoch's acute intoxication was the primary if not the sole precipitating cause of death."

## IV. DISCUSSION

**A. Does the plan fall under ERISA?**

A key question in this matter is whether the life insurance policy at issue here is governed by ERISA, 29 U.S.C. § 1001 *et seq*. In order for a plan to qualify as welfare plan under ERISA, five elements must be satisfied. It must be:

> (1) a plan, fund, or program, (2) established or maintained, (3) by an

> employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits, (5) to participants or their beneficiaries.

29 U.S.C. § 1002; *see also Postma v. Paul Revere Life Ins. Co.* 223 F.3d 533, 537 (7th Cir. 2000) (*citing Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 738 (7th Cir. 1986)).

The Department of Labor promulgated regulations setting forth a "safe harbor" provision that assists efforts to determine whether an insurance plan falls under ERISA. Under the safe harbor,

> the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
> (1) No contributions are made by an employer or employee organization;
> (2) Participation in the program is completely voluntary for employees or members;
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j).

Defendant bears the burden of establishing the existence of an ERISA plan. *See Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120 n.2 (9th Cir. 1998) (*citing Kanne v.*

5

*Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988)). Defendant in this case argues that the IBEW qualifies as an "employee organization" for the purposes of § 1002, and that the plan is exempted from the safe harbor exception because IBEW endorsed the program to its members. Defendant cites as support for this proposition the Master Agreement between Union Privilege and ULLIC, which requires subscribing unions to "promote, publicize and endorse to its Members . . . [and to] assist in the marketing effort." The Subscription Agreement between IBEW, Union Privilege, and ULLIC requires the IBEW to (1) provide a list of local leaders to enable communication about the policy; (2) include advertisements or articles about the policy in any membership publication to eligible members; (3) include policy information in new-member and new-leader materials; (4) provide information about the policy at workshops, conferences and meetings; and (5) provide necessary materials for direct mail campaigns to members, as well as to timely communicate responses to marketing materials submitted for approval. As further support for exemption from the safe harbor provision, Defendant notes that Union Privilege paid the premium for the threshold accidental death insurance coverage, a prerequisite to obtaining the accidental death and dismemberment coverage.

First, I must determine whether ERISA governs the plan at issue, and I find that it does. The second element - whether Cabernoch's accidental death insurance plan was established or maintained by an employee organization - is at issue. The policy involved in this case was issued by Union Privilege, which does not qualify as an employee organization as defined by 29 U.S.C. § 1002(4).[2] But the IBEW, a labor union, is an employee organization for ERISA purposes. Did

---

[2] "The term "employee organization" means any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with

it maintain or establish the plan?

> The critical factor is the employer's level of administrative involvement in the plan. Defining which employees are eligible to participate, contributing to premiums and performing some administrative functions can all implicate ERISA. On the other hand, allowing insurance carriers access to employees on a neutral basis, or withholding the employees' premiums from paychecks is generally not enough to bring a plan within ERISA's coverage.

*Russo v. B&B Catering, Inc.*, 209 F. Supp. 2d 857, 859 (N.D. Ill. 2002). However, in *Brundage-Peterson v. Compcare Health Services Ins. Corp.*, the Seventh Circuit noted that "[a]n employer who creates by contract with an insurance company a group insurance plan and designates which employees are eligible to enroll in it is outside the safe harbor created by the Department of Labor regulation." 877 F.2d 509, 511 (7th Cir. 1989) (A "barebones" ERISA plan is outside the safe harbor provision where it has "three components: the contractual arrangements between the employer and the insurance companies whereby the latter agreed to insure the former's employees; the eligibility requirement of being an employee of more than thirty days' standing; and the employer's contribution of the worker's share of the insurance premiums." *Id.* at 511.) In this case, there is a contractual agreement between the employee group and the insurance company.[3] The contract defines "member" as "any individual deemed by a Subscribing Union to be eligible for participation in the Program, and may include employees or associate members of the Union." Although Unioncare administers and services the plan, IBEW pays no premiums on

---

employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan." 29 U.S.C. § 1002(4).

[3] Although this contractual agreement was not the initial formation of the plan, which was "created" at the signing of the Master Agreement between Union Privilege, ULLIC, and Unioncare, IBEW's subscription to the plan marked the "creation" of a plan for its members.

behalf of its employees (although Union Privilege does pay the premium for a "limited amount of insurance" under the policy), and Cabernoch purchased his coverage via a direct mail solicitation and not through IBEW, *Compcare* dictates that the plan at issue is an ERISA plan, not exempt under the safe harbor.

### B. Status Intoxication Exclusion

Although the plan at issue is an ERISA plan, state law governs the question of whether the status intoxication exclusion is enforceable. ERISA does contain a preemption provision, which provides that all state laws are superceded insofar as they relate to employee benefit plans. 29 U.S.C. § 1144(a). This provision, however, is limited by a "savings" clause, which saves from preemption "any law of any State which regulates insurance, banking or securities." 29 U.S.C. § 1144(b)(2)(A). Generally, state laws "regulating the substantive content of insurance contracts are laws that regulate insurance and thus are within the scope of the insurance savings clause." *Metro. Life Ins. Co. v. Mass. Travelers Ins. Co.*, 471 U.S. 724, 741 n.18 (1985).[4]

---

[4] Although the savings clause is itself modified by a "deemer" clause, which states that neither an employee benefit plan nor any trust established under such a plan "shall be deemed to be an insurance company. . . for the purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies," 29 U.S.C. § 1144(b)(2)(B), the deemer clause is irrelevant here, since the defendant in this case is an insurance company, not an employee benefit plan or related trust. The deemer provision does not prevent state law from indirectly affecting benefit plans by regulating the contents of policies issued by insurance companies, which fall within the scope of the Illinois Insurance Code. *See Wadsworth v. Whaland*, 562 F.2d 70, 78 (1st Cir. 1977) ("[O]n its face the deemer provision does not prohibit a state from indirectly affecting plans by regulating the contents of group insurance policies purchased by the plans[,]" where state law regulates group policies generally.); *and Russo v. Boland*, 103 Ill.App.3d 905, 909-10 (Ill. App. 1982) (Where self-insured trust cannot be deemed an insurance company under deemer clause and Illinois Insurance Code is not expressly applicable to benefit trust, the state regulation is not saved from preemption.). Furthermore, the Illinois Insurance Code regulates group policies generally. *See* 215 ILCS 5/367 (group policy must contain "in substance those provisions contained in Section 357.1 through

Under the Illinois insurance code in force in 2003, the status intoxication exclusion at issue is unenforceable. In *Holloway v. J.C. Penney Life Insurance*, 190 F.3d 838 (7th Cir. 1999), the Court found a similar status exclusion[5] in violation of 215 ILL. COMP. STAT. 5/357.14 and 5/357.26 (repealed 2008).[6] Section 357.25 addresses the issue of intoxication exclusions and provides the following model policy language:

"INTOXICANTS AND NARCOTICS: The company shall not be liable for any loss sustained or contracted in consequence of the insured's being intoxicated or under the influence of any narcotic unless administered on the advice of a physician."

Section 357.14 provides in relevant part:

> Except as provided in section 357.26, no such policy delivered or issued for delivery to any person in this State shall contain provisions respecting the matters set forth in sections 357.15 through 357.25 unless such provisions are in the words in which the same appear in this article; provided, however, that the company may, at its option, use in lieu of any such provision a corresponding provision of different wording approved by the Director which is not less favorable in any respect to the insured or the beneficiary.

The Court in *Holloway* held the status intoxication exclusion to be less favorable to the insured or beneficiary than the model language in section 357.25, which contains a causation requirement, and therefore invalid under the section 357.14.[7] 190 F.3d at 844.

---

357.30….").

[5] The exclusion at issue in *Holloway* provided that "[n]o benefit shall be paid for Loss that occurs while the Covered Persons blood alcohol level is .10 percent weight by volume or higher." 190 F.3d at 839.

[6] The relevant statutory provision was repealed in 2008. The parties do not dispute that the cited version was in force at the time of Cabernoch's death.

[7] The Court noted that under section 357.14, the Director of the Illinois Department of Insurance "was not authorized by statute to approve policies that were less favorable to the insured than the mandatory provision[ in section 357.25,]" and the Director's approval of the exclusion provision was therefore irrelevant.

The status intoxication exclusion contained in the policy at issue in this case is similar in effect as that in *Holloway* – "if the insured was sitting on [his] porch drinking beer and was struck by a meteor, [he] would not be covered by the policy." *Id.* at 839. And just as in *Holloway*, the exclusion provision is significantly less favorable to the insured and his beneficiaries than the model language provided in section 357.25. As such, it is unenforceable as written.

**C. Causation Requirement**

The question then becomes how to correctly read the exclusion in a manner that conforms with the requirements of the Illinois Insurance Code. The Court in *Holloway* looked to the model language of section 357.25; "Reading the policies in conformity with state law, the beneficiaries were entitled to recover unless the loss was a consequence of the decedents' intoxication." *Id.* at 839. While this is instructive, it leaves open the question of the type of causation required. It is well established under Illinois law that "to be totally excluded from coverage under an insurance policy, an injury must have been caused solely by a proximate cause excluded under the policy." *Northbrook Property and Cas. Ins. Co. v. Transportation Joint Agreement, et al.*, 722 N.E.2d 280, 283 (Ill. App. 1999), *rev'd on other grounds by* 741 N.E.2d 253 (Ill. 2000). That is not the case here. While it may be true that, but for Cabernoch's intoxication, he might have been able to exit the burning vehicle, saving himself from subsequent smoke inhalation and burns, Defendant fails to show that intoxication was the sole proximate cause of the injury. "A proximate cause of an injury is any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time[ ] which[,] in combination with it, causes the injury." *Faulkner v. Allstate Life Ins. Co.*, 684

10

N.E.2d 155, 158-159 (Ill. App. 1997) (citation omitted). It is in no way foreseeable that Cabernoch's intoxication would result in fatal smoke inhalation and thermal burns. Further, it is unforeseeable that the parked vehicle in which Cabernoch sat would catch fire, especially in light of the fact that the cause of the fire remains unknown. *See Bentley v. Saunemin Tp.*, 413 N.E.2d 1242, 1245 (Ill. 1980) ("The negligence of a defendant will not constitute a proximate cause of a plaintiff's injuries if some intervening act supersedes the defendant's negligence, but if the defendant could reasonably foresee the intervening act, that act will not relieve the defendant of liability."). The car fire was an unforeseeable intervening act. Therefore, Cabernoch's intoxication was not the proximate cause of his injuries, and Plaintiff is entitled to recover Cabernoch's death benefit.

**D. Civil Penalty**

Because the plan at issue in this case is an ERISA plan, Plaintiff's claims for fees and statutory damages under 215 ILCS § 5/155 and for prejudgment interest under 215 ILCS 5/224 are precluded. These sections do not regulate insurance, but rather provide a remedy for a violation. Because "…ERISA's civil enforcement remedies were intended to be exclusive[,]" Plaintiff's claim pursuant to section 155 and 224[8] are not saved by 29 U.S.C. § 1144(b)(2)(A) and are therefore preempted. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54-57 (1987).

---

[8] Furthermore, section 224 is not applicable to group policies. 215 ILCS § 5/224(1).

## V.  CONCLUSION

As to Plaintiff's claim for benefits, I find no genuine issue of material fact and grant Plaintiff's motion for summary judgment. I grant Defendant's motion for summary judgment with regard to Plaintiff's section 155 and 224 claims, as they are pre-empted by ERISA.

ENTER:

_____
James B. Zagel
United States District Judge

DATE:  April 6, 2009